Filed 8/29/14  City of Long Beach v. Public Employees Relations Board CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CITY OF LONG BEACH,<br><br>　　　　　　　Petitioner,<br><br>　　v.<br><br>PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>　　　　　　　Respondent;<br><br>INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS LOCAL LODGE 1930, DISTRICT 947,<br><br>　　　　　　　Real Party in Interest. | No. B245981<br><br>(PERB No. LA-CE-537-M) |

ORIGINAL PROCEEDING; petition for writ of mandate.  Petition denied.

Atkinson, Andelson, Loya, Ruud & Romo, Nate J. Kowalski, and Lisa M. Carrillo for Petitioner City of Long Beach.

Public Employment Relations Board, M. Suzanne Murphy, Wendi L. Ross, and Ellen C. Wu for Respondent Public Employment Relations Board.

Weinberg, Roger & Rosenfeld, David A. Rosenfeld, Kerianne R. Steele, Sean D. Graham for Real Party in Interest International Association of Machinists & Aerospace Workers Local Lodge 1930, District 947.

_____

The City of Long Beach (City) petitions for writ of extraordinary relief from a decision of the Public Employee Relations Board (PERB). The PERB determined that the City violated its obligations under the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.) (MMBA) by failing to meet and confer in good faith with the International Association of Machinists and Aerospace Workers (IAM) before implementing a mandatory furlough program for City employees.[1] We conclude that the City has failed to show that the PERB's decision was clearly erroneous or unsupported by substantial evidence, and we therefore affirm.

BACKGROUND

1. The City, the IAM, and the Furlough Program

At all relevant times, the City and the IAM were parties to a memorandum of understanding (MOU) that governed the terms and conditions of employment of City employees represented by the IAM. The MOU provides that "[t]he City reserves, retains, and is vested with all rights to manage the City," and those rights "include but are not limited to" the right "[t]o determine and/or change the size and composition of the City work force and assign work to employees." The MOU also provides as follows: "It is understood and agreed that there exists within the City, in written form, Personnel Policies and Procedures and Department Rules and Regulations. Except as specifically modified by this MOU, these rules, regulations, and Policies and Procedures, and any subsequent amendments thereto, shall be in full force and effect during the term of this MOU. . . . Employee wages and fringe benefits will not be reduced unless agreed to by the Union."

In addition, section 92 of the City's Civil Service Rules and Regulations (CSRRs) provides as follows: "For reasons of economy or due to a lack of work or funds, an appointing authority may reorganize or eliminate any department, bureau, or division, or

---

[1] All subsequent statutory references are to the Government Code unless otherwise indicated.

may abolish any position under its direct jurisdiction, and/or reduce the number of, or the hours worked by City employees."

The City's fiscal year begins on October 1 and ends on September 30. The City's financial management personnel monitor the budget throughout the year to make sure that the fiscal year will end in balance. The present dispute arises from steps the City took to balance the budget for the 2009 fiscal year, which began in October 2008.

On July 1, 2008, the city manager issued a budget message to the mayor and city council. The message projected a $16.9 million dollar "structural budget deficit" in the City's budget for the 2009 fiscal year and proposed measures to balance the budget. The total proposed budget for fiscal 2009 was $3.1 billion, of which $404 million "supports the General Fund, which provides resources for the majority of core municipal services such as public safety, public works, recreation, library services, legislative and administrative support." On September 9, 2008, the city council adopted a balanced budget for fiscal year 2009, incorporating measures to address the projected $16.9 million shortfall. Those measures did not include employee furloughs.

On October 23, 2008, Lori Ann Farrell, the City's director of financial management, sent a memo to the mayor and the city council, alerting them to budgetary consequences of the severe economic downturn that was then underway, proposing various steps to make sure that fiscal 2009 would end in balance. The memo noted, for example, that the decline in the price of oil to $60 per barrel from the $85 per barrel that was projected for purposes of the 2009 budget could itself generate "a potential shortfall of $5 million in General Fund revenue if it doesn't rebound above [$85 per barrel] during the year." The memo proposed that "[a]ll unbudgeted one-time monies will be deposited into the Budget Stabilization Fund," generating an estimated $6.35 million in "one-time resources" for the 2009 fiscal year, and also that "[a]ll non-essential budgeted one-time expenses will be placed on hold until further notice," which would "potentially conserve up to an additional $8 million in General Fund resources." (Boldface omitted.) In addition to two other proposed measures, the memo described the following possibility: "A mandatory five-day employee furlough will be explored. It is estimated

3

that a one-week furlough on non-public safety and non-critical employees would save approximately $700,000 - $900,000 in the General Fund in [fiscal year 2009]. While this action is certainly a meet-and-confer issue with the employee bargaining units, and would represent an approximately 2 percent salary reduction for participating employees, we hope for the full cooperation of all unions in finding a unified solution to our current challenges."

In a letter to the mayor and the city council dated December 1, 2008, Patrick H. West, the city manager, noted that although the fiscal 2009 "General Fund budget was structurally balanced upon adoption, which required solutions to overcome a projected $16.9 million structural deficit, the unforeseen economic freefall at the beginning of the fiscal year" was causing general fund revenue projections for fiscal 2009 to fall $19.2 million below the budgeted estimates, "about half of the loss caused by the steep drop in the price of oil." The letter stated that "[t]his economic turmoil has required serious and immediate fiscal strategies to ensure that the [fiscal year 2009] budget for the General Fund, along with several other funds, ends the year balanced. These included 2 percent – 6 percent spending reductions for City Manager-led departments, a 40-hour furlough of City employees or an equivalent savings, a hard hiring freeze, and the elimination of planned one-time expenditures."

Just eight days later, on December 9, 2008, a memo from Farrell to West reported that current estimates for general fund revenue for fiscal 2009 were "down approximately $15.7 million from the adopted budget." Farrell described the proposals from her October 23 memo, including "exploring the possibility of an employee furlough," and she recommended some additional measures "[t]o proactively address additional declines in projected General Fund revenue" that might develop if the economy continued to deteriorate.

On January 6, 2009, Farrell prepared a report to the mayor and the city council on the fiscal 2008 budget and the outlook for fiscal 2009. The report stated that for fiscal 2008, "[a]s of fiscal year-end, actual expenditures for all departments and all funds are $2.6 billion. Revenues for all departments and all funds are $2.7 billion. . . . For the

4

General Fund, actual expenditures for all departments were $388.8 million, or $3.4 million less than the Adjusted Budget of $392.2 million . . . . Actual General Fund revenues for all departments totaled $400.1 million." The report recommended depositing $3 million of the general fund surplus from fiscal 2008 into the City's budget stabilization fund "to help address a projected $15.7 million revenue shortfall in the General Fund in [fiscal 2009]." The report also repeated a previous recommendation to deposit $6 million that the City received in a settlement into the budget stabilization fund. The city council followed both recommendations, depositing the $9 million into the budget stabilization fund.

The City met and conferred with the IAM on January 29 and February 19 and 26, 2009, to discuss cost-saving measures for fiscal 2009. The parties discussed furloughs as one possible measure. At the January 29 meeting, the City told the IAM that a five-day furlough for "everyone minus police, fire" should generate "[$]1.5 million" in savings and would amount to a 1.92 percent reduction in employee income. At the February 19 meeting, the parties discussed various alternatives to furloughs, such as having employees pay a larger share of their contributions to PERS to generate savings for the City equivalent to a five-day furlough. At the February 26 meeting, the IAM reported that if the City could not promise that there would be no layoffs if a furlough were implemented, then the IAM's members would "rather have the layoffs instead of the furlough." The City stated that a five-day furlough would be "equivalent to 26 full-time positions." Again, the parties discussed various alternative cost-saving measures.

In a memo dated March 4, 2009, Farrell told West that revenue shortfalls for the general fund for fiscal 2009 were now estimated to be approximately $20 million. Farrell further stated that because of "the current outlook and the structural budget deficits we expect for fiscal years 2010, 2011 and 2012, the time to begin taking bold, permanent steps to address our General Fund budget shortfalls has come. As such, consuming limited one-time resources to address what is apparently a structural deficit is no longer a recommended solution." Regarding furloughs, the memo stated the following: "With the significant financial challenges the City is facing, we are planning on implementing a

5

five-day (40 hours) employee furlough during the current fiscal year, which is estimated to generate approximately $4 million in savings to the General Fund. The furlough will likely take place the last Friday of the month from May to September in the current year. . . . We have met with all employee associations to discuss furloughs and will continue to welcome further discussion with the Unions of alternatives that would achieve the same savings in the current fiscal year. We will continue to keep the City Council informed prior to implementation of these cost-saving measures."

On March 5, 2009, the MOU implementation committee met. The possibility of furloughs was discussed at that meeting.

On April 9, 2009, the City and the IAM again met and conferred concerning cost-saving measures. Again, the parties discussed the possibility of furloughs.

According to the testimony of the City's manager of personnel operations, Ken Walker, sometime in mid-April "the City decided to recommend to the city council to have five days of furloughs." On April 22, 2009, the IAM's chief spokesman emailed the City's director of human resources, stating the following: "I understand that City Council will be voting to go forward with the furloughs at their council meeting on May 5th. This kind of makes our May 7th meeting nothing more than an update to what we already know. I'm receiving a lot of pressure to do something, yet I'm not quite sure what to do. I have instructed our attorney to file unfair labor practice charges with PERB for failure to negotiate the furloughs." He also added, "Let me know if you . . . still want to meet with me on the 7th at 11:00 a.m., or if you think maybe meeting sooner might be better."

The director of human resources responded on April 23, 2009, claiming that at the April 9 meeting she had informed the IAM negotiating team that (1) "the City Manager was going to have to move forward [with the furloughs] if there were no alternatives to negotiate" and (2) "a resolution would be going to the City Council shortly and that the needed savings could not wait." She added that "[w]e will remain available to discuss alternatives with all Unions" and that "negotiated alternatives can follow implementation." She also said, "Let me know if you and the negotiating team would like to meet before May 5. I am available."

6

At the May 5, 2009, meeting of the city council, West recommended adoption of a resolution "authorizing implementation of an employee work furlough in order to generate an amount equivalent to 1.92 percent in pay (40 hours for regular, full-time employees) for all permanent City employees in Fiscal Year (FY) 2009." The city council approved the recommended resolution. The resolution provided that "[e]mployee work furloughs equivalent to 1.92 percent of annual salary (i.e., 40 hours of unpaid time off for a regular full time employee) be implemented . . . . [¶] Work furloughs may not be required in the event alternative equivalent employee generated savings are negotiated with a labor organization."

On May 7, 2009, the City and the IAM met as scheduled. The City's notes of the meeting state that the "IAM indicated that there is no agreement they are interested in regarding furlough." The notes also reflect that Farrell was planning to make a "financial presentation" of some kind at the end of the meeting. According to the notes, the IAM representatives were concerned that their attendance at the presentation would be interpreted as "opening the contract," and they did not "want any misunderstanding that they are opening discussions." They accordingly ended the meeting and left before Farrell had the opportunity to give her presentation.

On July 21, 2009, the City adopted a resolution declaring a fiscal emergency.

2.     Procedural History

On May 26, 2009, the IAM filed with the PERB an unfair practice charge against the City. On October 12, 2010, the Office of the General Counsel of the PERB issued a complaint against the City for imposing the furloughs in violation of the statutory obligation to meet and confer in good faith. The City answered, admitting certain facts but denying the charges and asserting various affirmative defenses.

A PERB administrative law judge (ALJ) conducted a formal hearing on the charges on July 18-20 and August 26 and 29, 2011. On June 1, 2012, the ALJ issued his proposed decision. The ALJ concluded that the City violated the MMBA by implementing the furlough policy without first bargaining to impasse and presenting a last, best, and final offer. The ALJ also rejected the City's arguments that the

7

implementation of the furlough policy was authorized by the MOU and "by the City's legal authority to respond to an emergency."

The City filed exceptions to the ALJ's proposed decision and a brief in support thereof, and also a supplemental brief in support of its statement of exceptions. The IAM filed a response.

On December 4, 2012, the PERB issued its decision. The PERB affirmed the ALJ's determination that the City "violated the MMBA by unilaterally implementing the furloughs."

The City timely petitioned this court for a writ of extraordinary relief from the PERB's decision. We issued an order to show cause.

STANDARD OF REVIEW

Judicial review of the PERB's factual findings and interpretations of controlling statutes is deferential. By statute, "[t]he findings of the board with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, shall be conclusive." (§ 3509.5, subd. (b).) As for statutory interpretation, "[a]ppellate courts . . . generally defer to PERB's interpretations of controlling statutory provisions" (*California State Employees' Assn. v. Public Employment Relations Bd.* (1996) 51 Cal.App.4th 923, 933), and "[u]nder established principles PERB's construction is to be regarded with deference by a court performing the judicial function of statutory construction, and will generally be followed unless it is clearly erroneous." (*San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856.) "PERB is 'one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.' [Citation.] '[T]he relationship of a reviewing court to an agency such as PERB, whose primary responsibility is to determine the scope of the statutory duty to bargain and resolve charges of unfair refusal to bargain, is generally one of deference' [citation], and PERB's interpretation will generally be followed unless it is

8

clearly erroneous." (*Banning Teachers Assn. v. Public Employment Relations Bd.* (1988) 44 Cal.3d 799, 804.)

DISCUSSION

The City argues on various grounds that the PERB's decision must be overturned. We conclude that the City's arguments lack merit, and we therefore deny the petition.

Before turning to detailed consideration of the City's arguments, we wish to acknowledge a general theme of the City's briefing, namely, that the economic crisis of 2008 to 2009 was profound and had severe consequences for the City's budget, leaving the City no choice but to take urgent measures—such as imposing furloughs—in order to offset revenue shortfalls. The severity of the economic crisis and its impact on the City's budget do not appear to be in dispute, and we need not address them. Rather, the issue before us is whether the City has shown, under the highly deferential standard of review, that the PERB clearly erred, or relied on unsupported factual findings, when it determined that the manner in which the City implemented the furlough program violated the IAM's procedural rights. We conclude that the City has failed to make that showing.

I.      The City Had a Duty to Meet and Confer

Under the MMBA, "[t]he governing body of a public agency . . . shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment" with certain "recognized employee organizations." (Gov. Code, § 3505; see *San Joaquin County Employees Assn. v. City of Stockton* (1984) 161 Cal.App.3d 813, 818.) Nonetheless, the City argues on multiple grounds that it had no duty under the MMBA to meet and confer with the IAM concerning the furlough program. We conclude that none of the City's arguments has merit.

A.      Section 92 of the CSRRs

The City raises several arguments based on section 92 of the CSRRs, which authorizes the City, "[f]or reasons of economy or due to a lack of work or funds," to "reduce the number of, or the hours worked by City employees." The City argues that (1) the CSRRs "[a]re incorporated into the [p]arties' MOU and [t]rump the [m]eet and [c]onfer [r]equirements of the MMBA"; (2) the CSRRs would apply to the same effect

9

even if they were not incorporated into the MOU; and (3) because of the City's status as a charter city and the existence of section 92 of the CSRRs, the City is "[e]xempt" from the MMBA's meet-and-confer requirements. (Bold and underlining omitted.)

All of those arguments lack merit. "It has long been settled that, insofar as a charter city legislates with regard to municipal affairs, its charter prevails over general state law. [Citations.] However, as to matters of statewide concern, charter cities remain subject to state law. [Citation.]" (*Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 315-316.) The Supreme Court has held that the meet-and-confer requirements of the MMBA "must be met" by charter cities, because "[f]air labor practices, uniform throughout the state," are a matter of statewide concern. (See *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 594, 600 (*Seal Beach*); see also *Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 657). In *Seal Beach*, the Court concluded that there was no conflict between a charter city's "unchallenged constitutional power . . . to propose charter amendments" and the procedural meet-and-confer requirements of the MMBA, because the city "may still propose a charter amendment if the meet-and-confer process does not persuade it otherwise." (*Seal Beach*, *supra*, 36 Cal.3d at pp. 597, 601.) The same analysis applies here: The meet-and-confer requirements of the MMBA do not conflict with the City's powers under section 92 of the CSRRs, because the City can still exercise those powers if the meet-and-confer process does not persuade it otherwise. Because there is no conflict, there is no question of the local provision "trumping" the MMBA, or vice versa, and it does not matter whether the CSRRs are incorporated into the MOU or apply of their own force (or neither or both).[2]

---

[2]     Insofar as the City's arguments based on section 92 of the CSRRs are meant to be based on the City's powers to address fiscal emergencies, we address them separately in our discussion of emergencies. Section 92 of the CSRRs says nothing about emergencies.

10

The City's only response to this analysis is that section 92 of the CSRRs is "substantive," not "procedural," and therefore is not "subject to any superseding bargaining requirements under the MMBA." The argument is purportedly based on the Supreme Court's statement that "'there is a clear distinction between the *substance* of a public employee labor issue and the *procedure* by which it is resolved. Thus there is no question that "salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws." [Citation.] Nevertheless, the process by which the salaries are fixed is obviously a matter of statewide concern and none could, at this late stage, argue that a charter city need not meet and confer concerning its salary structure.' [Citation.]" (*County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 289.)

The City's argument that the MMBA meet-and-confer requirements do not apply because section 92 of the CSRRs is substantive fails for two independent reasons. First, because there is no conflict between the meet-and-confer requirements and section 92 of the CSRRs, it does not matter whether section 92 is substantive or procedural or anything else. Second, regardless of whether section 92 is substantive, the dispositive point is that *the MMBA meet-and-confer requirements are procedural and a matter of statewide concern*. They do not intrude upon the City's plenary authority to determine the wage levels for City employees; they merely affect the *process* by which those wage levels will be set. (See *Seal Beach*, *supra*, 36 Cal.3d at p. 597 [the MMBA "established a procedure for resolving disputes regarding wages, hours and other conditions of employment, [but] it did not attempt to establish standards for the wages, hours and other terms and conditions themselves"].)[3]

---

**3**     In connection with the contention that section 92 of the CSRRs is substantive, the City relies on *State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547 (*City of Vista*), but the City's reliance is misplaced. In *City of Vista*, the Supreme Court held that charter cities are not bound by California's "prevailing wage law," which "requires that certain minimum wage levels be paid to contract workers constructing public works." (*Id.* at p. 552.) The Court distinguished the prevailing wage law from the meet-and-confer requirements of the MMBA, because the prevailing wage law "imposes substantive obligations on charter cities, not merely generally applicable procedural standards." (*Id.* at p. 565.)

11

B.    Waiver

As noted earlier, the MOU provides that "[t]he City reserves, retains, and is vested with all rights to manage the City," and those rights "include but are not limited to" the right "[t]o determine and/or change the size and composition of the City work force and assign work to employees."  The City argues that this "management rights" clause of the MOU "constitutes a 'waiver' of any objection that the IAM may have regarding the unilateral implementation of the temporary employee furlough."  We conclude that the PERB's rejection of this argument was not clearly erroneous.

"PERB has adopted the standard for waiver used by the National Labor Relations Board (NLRB), which requires that a waiver of statutory rights be 'clear and unmistakable.'  A waiver will not be lightly inferred.  [Citations.]"  (*San Jacinto Unified School District* (1994) PERB Dec. No. 1078.)  "A generally-worded management rights clause will not be construed as a waiver of statutory bargaining rights."  (*Ibid.*)  Thus, under PERB precedent, the general reservation to the City of "all rights to manage the City" will not be construed as a waiver of the IAM's meet-and-confer rights under the MMBA.  And the specific reservation of the right "[t]o determine and/or change the size and composition of the City work force and assign work to employees" does not clearly and unmistakably reserve to the City the right to impose furloughs without first meeting and conferring.  On the contrary, that provision on its face does not appear to relate to furloughs and is consistent with the MMBA's meet-and-confer requirements.  We therefore conclude that the PERB did not clearly err when it rejected the City's waiver argument based on the management rights provisions of the MOU.

C.    Emergency

The City argues that it faced "a fiscal emergency that justified the unilateral imposition of a temporary employee furlough."  We conclude that the PERB's rejection of this argument was supported by substantial evidence and was not clearly erroneous.

The PERB has long recognized that "a compelling operational necessity can justify an employer acting unilaterally before completing its bargaining obligation. [Citation.]  However, the employer must demonstrate 'an actual financial emergency

12

which leaves no real alternative to the action taken and allows no time for meaningful negotiations before taking action.' [Citation.]" (*County of Santa Clara* (2010) PERB Dec. No. 2120M.)  When the City unilaterally imposed the furloughs, it had untapped reserves (in its budget stabilization fund) that exceeded the savings to be generated by the furloughs, and the City did not officially declare a fiscal emergency until more than two months later.  Those facts alone are sufficient to support the PERB's determination that the City failed to demonstrate that there was no real alternative to the action taken and no time for meaningful negotiations before taking action.

D.    *Professional Engineers*

The City argues that under *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989 (*Professional Engineers*), the city council did not have to meet and confer with the IAM before adopting the resolution authorizing the furlough program.  The argument lacks merit.

In *Professional Engineers,* the Supreme Court concluded that neither "the constitutional authority granted to [the Governor] by the California Constitution [nor] the existing statutory provisions pertaining to the terms and conditions of state employment granted [the Governor] or the [Department of Personnel Administration] the authority unilaterally to impose a mandatory unpaid furlough on state employees." (*Professional Engineers*, *supra*, 50 Cal.4th at p. 1041.)  The Court likewise rejected the contention that certain state employee memoranda of understanding "authorized the Governor unilaterally to reduce the hours and wages of covered employees in response to a burgeoning budget deficit." (*Ibid.*)  The Court further held, however, that when the Legislature later enacted (and the Governor signed) legislation revising the 2008 budget, it "validat[ed] the [furlough] plan that the Governor lacked authority to impose unilaterally." (*Id.* at pp. 1043-1044.)  The Court's analysis was based on California statutes under which a provision in a state employee memorandum of understanding that "requires the expenditure of funds" does not "become effective" unless the necessary expenditure of funds is "approved by the Legislature in the annual Budget Act." (§ 3517.6, subd. (b); see *Professional Engineers*, *supra*, 50 Cal.4th at pp. 1042-1044.)

13

Thus, when the Legislature revised its budget and reduced the "appropriation for state employee compensation to a level reflecting the reduced compensation to be paid to employees under the Governor's [previously unauthorized] furlough plan," the Legislature rendered ineffective any (state employee) MOU provisions to the contrary and, in effect, "endorse[d] . . . the two-day-a-month furlough plan" previously imposed by the Governor. (50 Cal.4th at pp. 1043-1044.)

*Professional Engineers* does not support the City's position in this case. Compliance with the meet-and-confer requirements of the MMBA (or analogous requirements concerning state employees) was not at issue in *Professional Engineers*. The statutes on the basis of which *Professional Engineers* validated the state employee furlough plan do not apply to charter city employees. The City cites no analogous statutes that would authorize the City's city council to impose furloughs without first complying with the meet-and-confer requirements of the MMBA. For all of these reasons, we reject the City's contention that *Professional Engineers* shows that the PERB erred or clearly erred.

## II.     The City Violated Its Duty to Meet and Confer

The City argues that if it did have a duty to meet and confer with the IAM concerning the furloughs, it discharged that duty as a matter of law. We disagree. Because the PERB's determination that the City violated its meet-and-confer obligation is supported by substantial evidence and is not clearly erroneous, we must affirm it.

The parties appear to agree that (assuming the City had a meet-and-confer obligation at all) the applicable standard is as follows: The parties were required to meet and confer in good faith until they reached either an agreement or an impasse in the negotiations; in the event of an impasse, the City could then impose its last, best, and final offer. PERB has interpreted the term "impasse" as meaning that "'the parties have considered each other's proposals and counterproposals, attempted to narrow the gap of disagreement and have, nonetheless, reached a point in their negotiations where continued discussion would be futile. [Another PERB decision] described impasse as the 'point at which the parties have exhausted the prospects of concluding an agreement and

14

further discussions would be fruitless.'" (*County of Riverside* (2014) PERB Dec. No. 2360M.)

The PERB argues that the record contains substantial evidence that (1) in mid-April 2009 the City decided to recommend to the city council that it implement the furlough plan, (2) the city council voted on May 5, 2009, to implement the furlough plan, and (3) the parties had not reached impasse as of May 5. We agree.

The City's manager of personnel operations testified that in mid-April "the City decided to recommend to the city council to have five days of furloughs." It is undisputed that the city council approved the furlough resolution on May 5. But as late as April 23, the City's director of human resources was still inviting the IAM's representatives to continue to negotiate over "alternatives" to the furloughs, and the city council's May 5 furlough resolution itself expressly contemplated the possibility that "alternative equivalent employee generated savings" might be "negotiated with a labor organization." That is substantial evidence that the parties had not reached a point at which further negotiations would be futile or fruitless.

The City presents no meritorious argument to the contrary. The City argues that an impasse sufficient to permit the City to act unilaterally can exist even if no party formally declares impasse. Our analysis does not depend on the lack of a formal declaration of impasse, so the argument is of no consequence.

The City also argues that when the IAM failed to respond to the City's April 23 offer to meet again before May 5, "the parties had effectively reached impasse." We are not persuaded. Although it might be reasonable to infer from the evidence that the parties reached impasse by May 5, it is also reasonable to infer that they did not. The PERB's determination that they did not is supported by substantial evidence and is not clearly erroneous. We must therefore defer to it.

Finally, the City argues that even if the parties were not at impasse by May 5, the IAM "waived its right to negotiate further over the furlough decision when it abandoned the negotiations." The argument appears to be based on both the IAM's failure to respond to the City's April 23 offer to meet again before May 5 and the IAM's

15

termination of the May 7 meeting before Farrell was able to make her "financial presentation." Again, applying a deferential standard of review, we must reject the City's argument.

The context of the City's April 23 offer supports a reasonable inference that the offer lacks the significance that the City attributes to it. On April 22, the IAM's chief negotiator emailed the City's director of human resources, telling her that he had heard that the city council "will be voting to go forward with the furloughs at their council meeting on May 5th." He stated that he was instructing the IAM's lawyer "to file unfair labor practice charges with PERB for failure to negotiate the furloughs," but he nonetheless offered to meet again sometime *before* the next scheduled meet-and-confer session on May 7. In her reply email on April 23, the director of human resources confirmed that the City was moving ahead with the furloughs but would "remain available to discuss alternatives with all Unions," adding that "negotiated alternatives can follow implementation." In closing, she said, "Let me know if you and the negotiating team would like to meet before May 5. I am available." Thus, (1) the director of human resources' email confirmed the IAM negotiator's understanding that the City had already decided to move forward with the furloughs, merely adding that the City was open to negotiating alternatives after the fact, and (2) the director of human resources responded to the IAM negotiator's offer of an expedited meeting by asking if he wanted an expedited meeting. Consequently, a reasonable interpretation of the City's April 23 offer is that it was *not* an offer to engage in negotiations that were capable of averting the City's adoption of the furlough plan. Rather, it was an invitation to negotiate post hoc alternatives to the furlough plan that the City had already decided to adopt. It was not unreasonable for the PERB to conclude that the City's decision to adopt that plan without first negotiating to impasse or agreement was itself a violation of the MMBA, and an invitation to negotiate post hoc alternatives does not cure the violation.

The IAM's termination of the May 7 meeting is likewise of no use to the City. As discussed above, the City had already violated its meet-and-confer obligations by adopting the furlough plan on May 5 without having negotiated to impasse or agreement.

16

The PERB's implied finding that the IAM's conduct at the May 7 meeting could not cure that violation is supported by substantial evidence and not clearly erroneous.[4]

For all of the foregoing reasons, we conclude that the City has failed to show that the PERB's determination that the City violated its meet-and-confer obligation was clearly erroneous or not supported by substantial evidence.

DISPOSITION

The petition is denied. The IAM shall recover its costs of this original proceeding. NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

JOHNSON, J.

---

[4]     The City asserts that the IAM "created the deadlock in the negotiations which existed as of that time, by its absolute refusal to explore ways in which cost savings could be achieved other than by furloughs." If the City is referring only to the May 7 meeting, the argument lacks merit for the reasons already given—the record contains substantial evidence that the City's meet-and-confer violation occurred before May 7, and the PERB did not clearly err by determining that the IAM was not obliged to try to talk the City out of the furloughs that were then a fait accompli and that the IAM's conduct at the May 7 meeting therefore could not cure the violation that had already occurred. If, however, the City's reference to the IAM's "absolute refusal to explore ways in which cost savings could be achieved other than by furloughs" is meant to apply to the entire course of negotiations, then the record contains substantial evidence to the contrary, namely, the City's notes of the various meet-and-confer sessions, which show that the IAM repeatedly put forward alternative cost-saving proposals.

17